**Robert Charles WELLS, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–86–00734–CR.**

Court of Appeals of Texas, Dallas.

April 20, 1987.

Rehearing Denied May 26, 1987.

Kerry P. Fitzgerald, Dallas, for appellant.

Kathi Alyce Drew, Asst. Dist. Atty., Dallas, for appellee.

Before HOWELL, McCLUNG and McCRAW, JJ.

McCLUNG, Justice.

Appellant was charged with aggravated robbery and tried before a jury. After appellant was convicted, the jury assessed a sixty-year sentence and $10,000 fine. He appeals, in part, on the basis that evidence of an extraneous offense was improperly admitted. We hold that the trial court erred in allowing this evidence to be admitted. Consequently, we reverse the judgment of the trial court and remand for a new trial.

Although appellant does not contest the sufficiency of the evidence, determination of the admissibility of extraneous offense evidence requires careful analysis of all the evidence presented.

The complainant is an ex-Marine and Waco businessman who owed the Internal Revenue Service (IRS) over $14,000 in back taxes. He testified that he met appellant in September of 1983 through an insurance broker acquaintance who introduced appellant as Fred Willis at a restaurant in Waco. According to complainant's testimony, they discussed, in general terms, raising $100,000 to buy one ounce gold coins (Krugerrands) from a wealthy individual who

owned several banks. During the conversation, appellant produced a Krugerrand and showed it to complainant and the insurance broker.

Complainant testified that at the initial meeting the broker explained that he and appellant had met with the unnamed banker in a motel room and got a good deal on Krugerrands. The terms of the Krugerrand deal emerged over the course of six or seven more meetings with appellant not attended by the broker. Throughout these meetings, complainant never revealed his full name to appellant. The terms proposed called for a substantial discount from the market price. Depending on the number of coins bought, the price of the Krugerrands would be from $175 to $250 each compared to a market value of around $400. Complainant was under the impression that the banker was avoiding taxes; for such reason, the coins were being sold at a discount; the transaction had to be in cash; and the banker's name could not be disclosed.

Against the advice of two banker acquaintances and a retired lieutenant from the McLennan Sheriff's department, complainant decided to proceed. The day before the transaction, January 10, 1985, complainant obtained about $80,000 in cash from his bank, primarily in $100 bills. He carried $2,200 in his pocket and $77,800 in a briefcase which he took home and buried in his backyard.

On the day of the transaction he dug up the briefcase and fastened it under the hood of his pick-up truck. In the cab of the pick-up complainant had a short-barrelled pistol and a briefcase not containing cash. Complainant also carried a set of scales to test the genuineness of the coins. Complainant testified that he planned to purchase the coins in Dallas and take them to a coin dealer in Euless who allegedly had quoted him a cash purchase price of $291 each.

Complainant proceeded to a hotel near I-35 to pick up appellant and drive to Dallas with the retired lieutenant following as planned. Appellant appeared slovenly and did not remove his gloves on the way to Dallas. At appellant's direction, they exited I-35 at Mockingbird Lane in Dallas and proceeded by a circuitous route to a nearby office building on Empire Central. Major construction on the building was complete but the interior was not finished.

As instructed by appellant, complainant parked the truck near an exit door in a parking area beneath the building. Complainant removed the money-laden briefcase from underneath the hood and noticed that the retired lieutenant was in the parking area. Complainant showed the cash to appellant and they proceeded to the door. Appellant knocked on the door and when it opened he shoved complainant inside where two men were waiting. The larger man had a pistol which complainant believed, from his military experience, to be a .45 caliber automatic. This man displayed what appeared to be an IRS card, told complainant he was with the IRS, and asked complainant to acknowledge his identity by name. After complainant admitted to being J___ N___ T___, the smaller man told complainant to put his head against the wall and roughly handcuffed complainant's hands behind his back. Appellant had gone off somewhere but returned after complainant was handcuffed. Complainant asked appellant what was happening. Complainant was taken to a pre-1980 Cadillac and driven around. Appellant was in the back seat with complainant and the other two were in the front. They told complainant that he was being taken to the Attorney General's office. During the ride, appellant told complainant that they knew he did not want to pay the IRS because they had it on tape. Complainant complained several times about the tightness of the handcuffs. Complainant was eventually taken to a different building with an enclosed parking area, removed from the car, and told to place his head next to a concrete pillar. The abductors told complainant that they were going to loosen his handcuffs. Instead, they removed his handcuffs and sprayed a mace-like material in his face. Complainant was released and in great discomfort he ran up a ramp of the building into a medical office in that building where he was treated and

the police were called. The officer dispatched on the call returned with complainant to the Empire Central location where the retired lieutenant was still waiting.

Complainant testified that he informed the police of the insurance broker's involvement but did not confront the broker with the robbery or ever mention it to him. Complainant wrote a detailed report and sent it to the Dallas police. When he was paying his electric bill, complainant noticed a picture on the wall of the electric company building in Waco that resembled appellant. Complainant hired a photographer to take a picture of that picture and sent it to the Dallas police.

The record is not clear, but suggests that complainant provided police with the license number of a car registered to appellant. This license number was used to identify appellant as a suspect.

On July 23, 1985, police received information about activity at appellant's last known address in Lake Dallas. Dallas Police observed three or four U–Haul trucks being loaded there by uniformed men at the direction of a white female. Dallas Police and Texas Rangers followed the trucks when they left with the female in the largest one, which also had a trailer. At Bonham, a white male was noticed to get into the truck with the female. In Paris the truck was stopped by local police and appellant arrested by his pursuers after first claiming to be B___ L___.

In the cab of the truck was a bag which contained a loaded .38 caliber pistol and over $57,000 cash in all denominations. The police also found cashier's check receipts for $9,000 and $8,000, both made payable to B___ L___. They also found a handcuff key and two safe deposit box keys.

A photo lineup was assembled and complainant identified appellant without hesitation. The other two Dallas participants were identified to be college friends of appellant. The insurance broker turned out to be a high school friend of appellant.

Appellant's wife testified that she was with appellant when he was arrested and denied that the pistol was loaded or that it was in the money bag at the time of the arrest. Appellant presented a reputation witness who testified to complainant's bad reputation for truth and veracity. This witness also testified that he was present at one of the meetings between complainant and appellant and that appellant used his correct name. Appellant next called the insurance broker who testified that appellant used his correct name at the initial meeting and, in fact, had exchanged business cards with complainant. A mini-warehouse deal was discussed and Krugerrands were never mentioned. The broker also confirmed that complainant had never mentioned the robbery and complainant continued to do business with him.

In rebuttal the court allowed the State, over objection, to present evidence of an extraneous offense which occurred six months after this one and which involved appellant and the two Dallas participants in the robbery here. The alleged victim of this extraneous offense was a resident of Arkansas, and he testified that after discussions with several friends in Dallas he decided to proceed with a deal involving Krugerrands. The alleged victim testified that on June 6, 1985 in the company of appellant and two others, he took $300,000 in $100 bills to an office building, apparently vacant, near the location where complainant was robbed. The three were directed to this location by appellant where they were confronted by an individual who displayed an ostensible F.B.I. identification card and a gun. A coin dealer accompanying the alleged victim recognized this individual as a fellow coin dealer and blurted out his first name. The alleged victim testified that all three were placed on the floor, handcuffed, and robbed.

The robber who was recognized testified that appellant ordered him to "take care" of the person who recognized him but he refused. This robber also testified that appellant had a can of mace during this transaction and that appellant told him that he had used it on someone before and it brought that person to his knees. Finally, the officer who investigated the extraneous offense testified that the safe deposit box

keys found on appellant when he was arrested fit boxes in Oklahoma containing over $120,000 in $100 bills and based on serial numbers, a lot of the cash in the Oklahoma safe deposit boxes came from the June 5, 1985 robbery.

Appellant contends that the evidence of the extraneous offense was (1) not relevant to a material issue in this case and (2) any probative value did not outweigh its prejudicial effect. Assuming, without so holding, that the two offenses are sufficiently similar to be relevant for any purpose, our task is to determine whether the probative value of this evidence outweighs its prejudicial effect. *Clark v. State*, 726 S.W.2d 120 (Tex.Crim.App.1987) (en banc) (per curiam) (op. on reh'g).[1]

We note initially that the Court of Criminal Appeals has addressed the problem of extraneous offense evidence frequently and that the above analytical framework is not capable of mechanical application. However, the cases indicate that the greater the need for the evidence, the more likely it will be admissible, assuming, of course, that it is relevant. *Clark v. State, supra, and* (en banc) (not admissible in circumstantial evidence case where not necessary to shore up State's case or disprove an otherwise innocent intent); *Boutwell v. State*, 719 S.W.2d 164 (Tex.Crim.App.1986) (not admissible to show identity or refute alibi defense where appellant known to complainant); *Morgan v. State*, 692 S.W.2d 877 (Tex.Crim.App.1985) (admissible to show intent where intent not inferable from act itself); *Prior v. State*, 647 S.W.2d 956 (Tex.Crim.App.1983) (not admissible to show intent where intent inferable from act itself).

Application of this "more probative than prejudicial" test can be illustrated by a comparison of the results of *Prior* with *Morgan* because the same mental state of each appellant was at issue in both cases. In *Morgan* the appellant was convicted of indecency with a child. The evidence indicated that the appellant had briefly touched complainant, an eight-year-old girl, where she "goes to the bathroom." Utilizing the principle that the requisite specific intent to arouse or gratify sexual desire can be inferred from conduct, this act, because of its brevity, was held insufficient to indicate such intent. Evidence indicated that a month prior to this incident appellant had put one arm around complainant's ten-year-old sister and put "the other around [her] private parts and started rubbing." The Court of Criminal Appeals held that the extraneous transaction was relevant to intent and, under these facts, was more probative than prejudicial. *Morgan*, 692 S.W.2d at 881.

The appellant in *Prior* was also convicted of indecency with a child. The sixteen-year-old complainant testified that she went to a store to seek employment. At the entrance to the store she observed appellant five to eight feet away. Appellant was looking at her, exposed his erect penis and "was moving it back and forth" with his hand. Shortly thereafter, inside the store, an employee observed the back of appellant, who appeared to be dancing. When he turned around, his pants were unzipped and he was holding his erect penis in his hand, masturbating. Appellant looked at the employee and smiled. The State, over objection, then introduced evidence that appellant had exposed himself to a woman at a washateria a month later. The Court of Criminal Appeals held that the trial court erred in admitting evidence of the later offense, essentially because the circumstances so clearly indicated that his actions were done to arouse and gratify his sexual desire that there was no need for the extraneous offense evidence to show intent. *See Prior*, 647 S.W.2d at 959; *Morgan*, 692 S.W.2d at 881.

*Morgan* offered another way to look at the more probative than prejudicial test which is, in a sense, the converse of the need perspective. This view analyzes how much the extraneous offense testimony adds to the State's case. In the context of

---

**1.** The State asserted in its brief (filed January 12, 1987), that *Clark* was pending a motion for rehearing and that the original opinion had been withdrawn. To the contrary, the February 11, 1987 opinion affirmed the original opinion of October 15, 1986.

the more probative than prejudicial test, the absolute probative value of the extraneous offense evidence is not compared to its prejudicial effect. It is the incremental probity of the evidence that is to be balanced against its potential for undue prejudice. *Morgan*, 692 S.W.2d at 880 n. 4 (citing *United States v. Beechum*, 582 F.2d 898, 914 (5th Cir.1978)).

■ Underpinning either perspective of this test are fundamental notions of fairness which are expressed by the prejudice component of the test. The Court of Criminal Appeals has often expressed due process concerns raised by the introduction of extraneous offense evidence. Introduction of extraneous offense evidence is inherently prejudicial; the accused is unfairly called to defend against a crime he is not charged with and his propensity to commit crimes is not material to whether he is guilty of the crime charged. *See Elkins v. State*, 647 S.W.2d 663, 665 (Tex.Crim.App.1983). This Court must carefully scrutinize those cases in which prejudicial evidence of extraneous offenses is admitted. *Clark, supra*, (October 15, 1986). We are aware that exceptions to inadmissibility are often employed as a subterfuge for the admission of propensity-type evidence. *See Boutwell v. State*, 719 S.W.2d 164, 180 (Tex.Crim.App. 1986) (common plan); *Garza v. State*, 632 S.W.2d 823, 829 (Tex.App.—Dallas 1982) *aff'd in part, rev'd in part* 715 S.W.2d 642 (1986) (intent). With this in mind, we proceed to apply the more probative than prejudicial test to the facts before us.

■ The subsequent Krugerrand scam was not admissible to show intent. Here, complainant's testimony was that a .45 caliber automatic pistol was used, he was handcuffed, driven around, and maced. When arrested, appellant denied his identity, he was fleeing, carrying household goods, a large sum of cash and a gun. These circumstances, and others recited above, abundantly indicate appellant's intent so that the extraneous offense offers little or no incremental probative value. *See Prior, supra. Compare Robinson v. State*, 701 S.W.2d 895 (Tex.Crim.App.1985) (admissible to show deceptive intent where appellant offered evidence of innocent intent). Therefore, on the issue of intent, any value is outweighed by its prejudicial effect.

Its probative value on the issue of identity is also little or none. Appellant was known to complainant; they met on seven or eight occasions. Complainant easily identified appellant in a lineup and never wavered in his identification. *See Boutwell, supra* (inadmissible to show identity where accused is known to complainant).

The State argues that the extraneous transaction evidence was needed because of appellant's jury argument and cross-examination. The extraneous offense was admitted prior to jury argument and we fail to understand how an event can create a need for rebuttal before the event occurs. The proper answer to improper jury argument is objection or rebuttal jury argument and not rebuttal extraneous offense evidence before argument commences. Furthermore, remarks by counsel are not evidence. We are also not persuaded that the cross-examination alone entitled the State to introduce extraneous offenses. The complainant here vigorously and consistently denied that he was involved in a scheme with appellant to fabricate a robbery. Questions put to a witness are not evidence. The answers and not the questions are determinative on the issue of whether the State's evidence is undermined. The Court of Criminal Appeals has clearly established that the exercise of the Constitutional right of cross-examination does not in and of itself open the door to the introduction of evidence of extraneous offenses. *Caldwell v. State*, 477 S.W.2d 877, 879 (Tex.Crim.App.1972). Appellant asked complainant if he was involved with appellant in a scheme to defraud the IRS. Complainant denied this and never weakened in his testimony. Furthermore, questioning did not reveal any inconsistencies in complainant's story. We conclude that appellant's questioning may have made complainant look foolish, but it did not make him any less a creditable witness. Consequently, we hold that the State's case was not sufficiently undermined to make the

probative value of the extraneous offense outweigh its prejudicial effect.

The State argues that the extraneous offense was admissible as part of a common plan or scheme. The problem with this argument is that the State does not tell us what the plan was; there is no evidence of a plan; and we are unable to discern a plan. A common plan requires a logical connection between the crimes, such as where the accused steals a gun to use in a subsequent robbery. Each crime is a step taken toward the accomplishment of the plan. *Boutwell*, 719 S.W.2d at 181. *Boutwell* gives the example of a man charged with murdering the husband of his former sweetheart. Evidence that he had poisoned his own wife was admissible as a necessary step in the completion of a formed design.[2] *Id.* The second robbery here was a separate event, not logically connected to the first robbery, and not part of any grand design shown by evidence. We hold that evidence, if any, of a common plan was not of a character to render the relevancy value of the extraneous offense evidence greater than its inflammatory potential.

Although the State concedes that there is no direct evidence of a defensive theory, we will discuss this exception as the final arguable rationale for admissibility. Including evidence adduced by the State, the following items are arguably defensive:

1) Complainant owed the IRS back taxes;

2) Complainant was able to pay the back taxes prior to trial;

3) Complainant entered the deal despite prior bad experiences with the insurance broker;

4) The broker testified that at the initial meeting

a) a mini-warehouse deal was discussed,

b) Krugerrands were not discussed,

c) appellant used his true name;

5) The broker and another testified to the bad reputation of complainant with respect to truthfulness;

6) A witness called by appellant testified that he sat in on a meeting between appellant and complainant and that appellant used his true name and Krugerrands were not discussed;

7) The withdrawal of $80,000 in cash would be required to be reported to the IRS;

8) After the robbery complainant continued to do business with Stanfield and did not confront him with the robbery;

9) Appellant's wife testified that she had the .38 caliber pistol when he was arrested and the pistol was not in the bag with the cash.

We are unable to discern any defensive theory from these facts. Furthermore, most items have, at worst, neutral explanations. Item 1) would just as easily explain complainant's motive for getting into the deal and why appellant picked him as a target. Item 2) indicates that the robbery gave complainant no tax benefit because he still had to pay the back taxes. Item 3) could indicate complainant's poor judgment and explain why he persisted despite the advice of his bankers and a friend. It is also consistent with the fact of this transaction being a bad one. Items 4), 5), and 6) are inconsistent with the State's evidence. Item 7) indicates that complainant had nothing to hide from the IRS and is consistent with his testimony to that effect. Item 8) is consistent with complainant's desire to get information from the broker that would be helpful in catching the robbers. Item 9) is inconsistent with the State's evidence.

The probative value of the extraneous offense evidence is a function of the effectiveness of these facts in undermining the State's case and setting up a defensive theory. The remaining facts fail to raise a defensive theory of fabrication. Indeed,

---

**2.** Another "removal of obstacles" example is illustrated by *United States v. Gaggi,* 811 F.2d 47 (2nd Cir.1987). Evidence was admitted that defendant participated in the murder of a car thief working with some members of an emerging scheme to export stolen cars. Other evidence indicated that the victim had become uncooperative and was creating difficulties for the would-be car exporters. The second circuit upheld the trial court's admission of this evidence on the theory that he was murdered to "pave the road" for the participation of more willing co-conspirators. *Gaggi,* 811 F.2d at 61.

they raise no defensive theory of any description. Items 4), 5), and 6) do not so much raise a defensive theory as they cast doubt on the veracity of complainant. Item 9) tends to cast doubt on the veracity of the arresting officer. Disregarding the effective cross-examination of these witnesses by the State, disregarding the interested nature of the testimony from the insurance broker and from appellant's spouse, and assuming that these items were indeed effective then we can measure the potential value of the extraneous offense evidence by the need created by these four items. The potential created by items 4), 5), and 6), however, is significantly reduced if not eliminated here by alternative sources of proof available to the State to rebut this defensive evidence which make the extraneous transaction evidence less necessary. Indeed, the State elicited testimony from both the retired lieutenant and the banker that complainant's reputation for truth and veracity was good. We are left solely with item 9) to justify the introduction of the extraneous transaction. Assuming that the presence or absence of the .38 caliber pistol in the bag with the money at the time of arrest is a material issue, and that the extraneous offense is relevant, then the incremental probative value is a measure of the tendency of the evidence to place the gun in the bag and thereby shore-up the arresting officer's testimony. We question whether such a value is measurable. We hold that the extraneous offense evidence here has no value as measured by its usefulness in rebutting defensive evidence. We hold further that the cumulative value over all exceptions is insubstantial.

Having determined the insignificant legitimate probative value of the extraneous offense evidence, it might appear that its presumed prejudice would obviate the need for a discussion of this half of the second step admissibility balance. Appellant did indeed suffer from the basic unfairness caused by the introduction of extraneous transaction evidence and we will not here rehash that widely reported phenomenon. We will, however, note that appellant felt compelled to devote about one-fourth of his jury argument responding to the extraneous offense evidence. Testimony by the robber who was recognized which portrayed appellant as a robber willing to murder was one concern. This testimony also indicated that appellant conducted other similar robberies in addition to these two. Here is a classic example of an accused being tried, not so much as for a crime, as for being a criminal. And this offends our system of justice. *See Garza*, 632 S.W.2d 823 *passim*. The admission of extraneous offense evidence was error.

This Court is required to reverse appellant's conviction, unless we determine beyond a reasonable doubt that the error made no contribution to his conviction or punishment. TEX.R.APP.P. 81(b)(2). Our analysis of the evidence convinces us beyond a reasonable doubt that the erroneous admission of the extraneous transaction evidence did not contribute to appellant's conviction. We are satisfied, however, in light of the sixty-year sentence and $10,000 fine, we cannot make such determination with respect to punishment. Consequently, we reverse the judgment of the trial court and remand the cause for a new trial.