**Frank J. HARGRAVES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–86–00996–CR.**

Court of Appeals of Texas, Dallas.

Sept. 23, 1987.

Rehearing Denied Nov. 2, 1987.

John H. Hagler, Dallas, for appellant.
Teresa Tolle, Dallas, for appellee.

Before HOWELL, STEWART and THOMAS, JJ.

THOMAS, Justice.

Hargraves stands convicted of aggravated sexual assault. After a finding of guilty by the jury, the trial court assessed punishment at forty-five (45) years in the Texas Department of Corrections. In two points of error, appellant contends that: (1) the evidence is insufficient to support the conviction and (2) the admission of an extraneous offense involving an assault and attempted robbery on a different complainant constituted reversible error. Because we agree with appellant's point of error number two, the judgment is reversed and remanded for a new trial.

### Sufficiency of the Evidence

In point of error number one, appellant contends that the evidence is insufficient to support the conviction. The indictment alleges that appellant did:

> then and there knowingly and intentionally cause penetration of the female sexual organ of [Martha F.], hereinafter called the complainant, a person not the spouse of the defendant, without the consent of the complainant by means of an object, to-wit: the sexual organ of Frank Hargraves, and in the course of this same criminal episode, used and exhibited a deadly weapon, to-wit: a knife.

The standard for appellate review of the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App.1984); *Wilson v. State*, 654 S.W.2d 465, 471 (Tex.Crim.App.1983);

*Carlsen v. State,* 654 S.W.2d 444, 448 (Tex. Crim.App.1983). Utilizing this standard, we now review the evidence in this case.

The complainant, a thirty-eight year old female, testified that she went to see a concert of the Canadian rock group, Rush, with her stepson, Terry, at Reunion Arena on the night of January 12, 1986. While in the arena, Terry ran into a group of friends and decided he would sit with them near the front of the stage. Terry showed complainant where her seat was in the balcony. They agreed to meet after the concert at the base of the stairs leading to the balcony. After the concert was over, she went to the prearranged meeting place. When Terry did not appear, she decided to go search for him. Dallas police officers assigned for crowd control were ushering everyone outside the arena, so complainant went outside the door. She stated that she then decided there may have been a miscommunication. Complainant walked toward the parking lot to look for the car. When she saw that the car was gone, she thought that Terry must have retrieved the car and gone back to pick her up. At this time, complainant started walking back to Reunion Arena.

Suddenly she was approached by the appellant who offered to get a taxi to take her back to the front gate. After a brief conversation she accepted and got into a nearby taxi with the appellant. Shortly thereafter, complainant became aware the cab was proceeding away from the arena. Appellant explained that they would go to his sister's house where she could use the telephone and he would borrow a car to bring her back downtown. According to complainant, during the cab ride appellant smoked marijuana and offered the complainant some although she did not accept his offer. They arrived at a West Dallas housing project where they exited the cab and entered one of the apartments. A black woman introduced to complainant as appellant's sister was at the apartment. Complainant, by this point confused and scared, told appellant she must be going. She stated that appellant's demeanor changed dramatically. He struck her across the face and said that she was "a

white bitch that needed to learn some respect!" Appellant then pulled a knife and held it to her temple. After smoking another marijuana cigarette and insisting that she do the same, appellant asked complainant "have you ever had any black dick?" The reply being in the negative, appellant said "well, I'm going to show you how good it is." Appellant then ordered her to remove all of her clothes. When the complainant replied that appellant really did not want to do that, she was struck again and told to "shape up and have some respect." Appellant then proceeded to rape the complainant, ejaculating on her stomach. Appellant then demanded that complainant give him a necklace which she was wearing and then commanded her to get dressed. Once she was dressed, appellant told her they would go to a nearby pool hall where she could use the telephone and call a cab. As they walked toward the pool hall, she was told to behave, do as he said, and not forget that he had a knife. They played pool and drank. While there, appellant told her to kiss him and put her legs over his lap, which she did. Complainant explained that she did not seek help from anyone because she thought they were all friends with appellant and she was afraid. Appellant decided to leave and forced her with threats to leave with him. According to complainant, she was then taken to another apartment where appellant forced her to expose her breasts to an old man on a couch. Appellant told her that this man would pay him fifty dollars for this. At some point complainant went into another room occupied by a teenage boy. She asked the boy for help but he ignored the request.

Appellant then took complainant to yet another apartment, where she was again threatened. She cannot remember anything that occurred at that apartment once she was ordered to go upstairs.

Finally, they returned to appellant's apartment. Complainant explained that during this ordeal she did not try to escape because she was not familiar with the area and was afraid that if she was caught, she would be killed. Once inside the apart-

ment, appellant again ordered complainant to remove her clothing. When complainant hesitated, she was struck once again. Appellant then made her get on her hands and knees and engage in oral sex. When that was finished, appellant took her into the living room and raped her a second time, again ejaculating on her stomach. There was another man sleeping in the apartment, later identified as "Mike", who woke up shortly after appellant finished raping the complainant the second time. Mike, who said he was a drug dealer, was told by appellant to watch complainant and not let her go. After appellant went into the bedroom and closed the door, Mike started taking off her clothing. Mike then told her that he was going into the kitchen to get a "rubber," and when he returned, he raped her. Complainant testified that she did not remember whether Mike utilized a condom. Sometime after this assault, she was able to escape from the apartment and run to a nearby business where she called her husband and the police.

The officer who responded to the call testified that before transporting complainant to Parkland Hospital, they attempted to locate the particular apartment, but were unable to do so. He further stated that she had a slight smell of alcohol about her but that she did not appear to be intoxicated nor did she appear to be under the influence of alcohol.

Dr. Alan Munoz, complainant's examining physician, testified that at the time she was brought in by the police, her general appearance was good and she was emotionally stable. This witness further stated that there were no signs of physical abuse such as lacerations or swelling. The doctor's record did not indicate that complainant informed him that she had been struck in the head.

Patricia Bucha, a forensic serologist, initially testified that the tests indicated that appellant could not be included in the population that donated the seminal fluid taken from the complainant. In response to further questioning, she stated that when there is more than one seminal fluid present, no interpretation can be made as to blood type of the donors. Therefore, she could not include or exclude appellant.

Officer Roberta Adame, the officer assigned to this case, testified that the complainant came to her office the day after the assaults for questioning. From complainant's description, she concluded that they were searching for a young black male, living in the projects, with massive scarring on his back. Officer Adame put together a photographic display of six photos. Complainant examined them and said none were the men who raped her. According to this witness, a few days later a report made her focus upon appellant, who was in jail in connection with another offense. This officer went to the jail and took pictures of appellant, including the massive scarring on his back. On that same day, the officer put together another photographic display with appellant's picture included. Complainant immediately recognized appellant as one of the men who raped her.

Officer Mark Sears testified he arrested the defendant on January 20, 1986 in connection with another incident. According to this witness, the appellant gave false names.

The first witness for the defense was Wanda Jackson, appellant's cousin. She testified that appellant and a white woman came to her apartment at around 2:00 a.m. on January 13. Mike and another woman were also present. According to this witness, they all sat around laughing, talking, drinking, and listening to music. She could not recognize the victim as being the woman in the apartment. She stated that the woman appeared to be with Mike. Appellant and the lady asked her if she could spend the night in Ms. Jackson's apartment, but Ms. Jackson said no so they left.

Appellant then testified in his own behalf. According to appellant, he walked up and joined a conversation between complainant, who was acting "high", and his friend Mike after the concert. He and Mike began to talk about going to an "after party" where the band would be signing autographs and complainant wanted to go.

According to appellant, they decided to go to his place and get "high" and then go to the party. Appellant and complainant took a cab to his apartment where his girlfriend was present. He stated that he and complainant drank beer, smoked marijuana and decided to go to the pool hall to purchase drugs. They drank, played pool and danced for a couple of hours. When they left, they stopped by his cousin's apartment. After leaving there, they returned to his place where complainant still insisted she wanted drugs. Shortly thereafter, appellant went to bed with his girlfriend leaving complainant in the living room to strike a deal with his drug dealer friend, Mike. At some point, appellant opened the door and saw them together on the couch. When appellant got up, complainant was gone and Mike was asleep on the couch. Appellant denied having sex with her, pulling a knife, or taking her to another apartment and forcing her to expose her breasts to another man.

He explained that he gave a false name at the time of his arrest because of a prior incident in South Carolina for which he was on probation. He also admitted using a false name with complainant and even withholding his true name from his attorney.

On rebuttal, the State called Sabrina Dimichele whose testimony will be set forth in detail in connection with the point of error number two.

The State then called five character witnesses who testified that the complainant's reputation in the community for truth and veracity was very good.

Appellant contends on appeal that the evidence is insufficient because of the substantial variance between his testimony and that of the complainant. As further evidence of reasonable doubt, appellant relies upon the testimony of the forensic serologist. Appellant further insists that the testimony of the complainant and her failure to attempt any kind of escape or seek assistance is simply not consistent with his guilt.

On appeal, the issue is not whether we as a court believe the prosecution's evidence or believe that the defense evidence "outweighs" the evidence put on by the State. If there is evidence which establishes guilt beyond a reasonable doubt, and if the trier of fact believes that evidence, we are not to reverse the judgment on sufficiency of the evidence grounds. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex.Crim.App.1984); *Combs v. State*, 643 S.W.2d 709, 716 (Tex. Crim.App.1982). While portions of the testimony were inconsistent and the evidence conflicting, the State's case was sufficient if the appellant's evidence was disbelieved. The jury, as is their right, observed the witnesses, passed on their credibility, and chose to believe the complainant. The evidence is sufficient to support the conviction. *See Brown v. State*, 605 S.W.2d 572, 575–75 (Tex.Crim.App.1980); *Winkle v. State*, 506 S.W.2d 891, 893–98 (Tex.Crim. App.1974), *cert. denied*, 419 U.S. 843, 95 S.Ct. 75, 42 L.Ed.2d 71 (1974); *Roddy v. State*, 494 S.W.2d 174, 175 (Tex.Crim.App. 1973); *Carter v. State*, 691 S.W.2d 112, 113–15 (Tex.App.—Fort Worth 1985, no pet.).

We hold that, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Appellant's point of error number one is overruled.

*Admissibility of the Extraneous Offense*

The State, after the defense rested, announced that it intended to offer an extraneous offense in rebuttal. Over appellant's objection, the State called Sabrina Dimichele as a witness. She testified that on January 20, 1986, she went to a downtown liquor store to make a purchase for her boss. While there she met Mike and they entered into a conversation concerning whether she wanted to buy some "pot" from him. Once she agreed, they arranged to meet at her car after work. When she arrived at the car, Mike was with appellant. According to this witness, the three of them squeezed into her two-seater car and drove to appellant's apartment to consummate the transaction. When the witness wanted to leave the apartment, appellant

grabbed her by the throat, threw her onto the sofa and told her she wasn't going anywhere. Mike told the appellant to back off and let her go. The witness ran to her car with appellant and Mike following her. She got to her car and unlocked the door but was unable to get in before appellant and Mike interceded. Appellant grabbed the necklace she was wearing and justified his actions by saying that it was collateral for a debt Mike owed him. Some kids walked by and she screamed for help. At this point appellant struck her. The witness finally got inside the car and appellant struck her again. She started the car and drove a few feet before appellant jumped on top of her, shut off the car, and threw the keys down the block. Appellant threatened to take her back to his apartment and insinuated he would get ten other men in there as well. She "understood" this to mean he was going to rape her and have ten other men rape her also. The police, who had been summoned by one of the kids who had observed the situation, then arrived and arrested appellant.

Appellant argues in point of error number two that the admission of this extraneous offense involving an assault and robbery constituted reversible error. We agree.

In order for an extraneous offense to be admissible a two-part test must be met. First, the extraneous offense must be relevant to a material issue in the case other than the defendant's character. Second, the extraneous offense must possess probative value which outweighs its prejudicial effect. *Clark v. State,* 726 S.W.2d 120, 124 (Tex.Crim.App.1987) (on rehearing); *Robinson v. State,* 701 S.W.2d 895, 896 (Tex. Crim.App.1985). The reasons for generally not allowing the admission of an extraneous offense are well reported: "... In a criminal proceeding, when the State seeks admission of an extraneous or similar transaction committed by the accused which constitutes a separate criminal offense, introduction of that extraneous offense transaction is inherently prejudicial, since the accused has no notice he will be called to defend against it, and his propensity to commit crimes is not material to

whether he is guilty of the specified conduct which is charged by the State...." *Elkins v. State,* 647 S.W.2d 663, 665 (Tex. Crim.App.1983). Rote application of general rules and "automatic" exceptions invoked for admission of extraneous offenses is not to be done. Rather, every case is to be examined on its own facts, strengths, and weaknesses to determine if the extraneous offense is relevant to a material issue, and whether the probative value outweighs the inherent prejudicial effect. *Boutwell v. State,* 719 S.W.2d 164, 174 (Tex.Crim.App.1986) (on rehearing).

The State asserts that Ms. Dimichele's testimony is evidence of appellant's plan, scheme, and intent to assault and terrorize white women. The State claims the evidence shows that appellant entices white women who are downtown into going to his apartment and that once they try to leave he assaults and robs them. This would rebut appellant's testimony that he never struck, robbed, or raped complainant and that she was always free to go. Consequently, the State asserts the evidence is admissible. Assuming, without so holding, that the extraneous offense was relevant to a material issue, we must further determine whether the probative value outweighs its prejudicial effect.

Where the State's need to prove intent is strong because of an otherwise innocent act, extraneous offenses are more likely to be probative than prejudicial. *Boutwell,* 719 S.W.2d at 174; *Morgan v. State,* 692 S.W.2d 877, 880 (Tex.Crim.App.1985). However, where the circumstances surrounding the offense are "abundantly supportive of the inference of intent," the necessity for extraneous offenses to prove intent is minimal and the prejudice arising from their admission, comparatively great. *Boutwell,* 719 S.W.2d at 174; *Wells v. State,* 730 S.W.2d 782, 785 (Tex.App.—Dallas 1987, pet. filed).

In our case, the evidence and circumstances surrounding the offense more than "abundantly supports the inference" of intent. Consequently, the extraneous offense offered little or no incremental probative value on the issue of intent. The pro-

bative value of this evidence in showing a common plan or scheme is, at best, slight. Appellant stands convicted of aggravated sexual assault. We fail to follow the State's logic that the fact that appellant took a piece of jewelry from each woman, one week apart, shows a common plan or scheme to commit aggravated sexual assaults. The extraneous offense involved in the instant case is simply not sufficiently similar to support its admissibility on a "common plan or scheme" exception to the general rule.[1] The introduction of an extraneous offense is, of course, inherently prejudicial. *Robinson*, 701 S.W.2d at 899; *Elkins*, 647 S.W.2d at 665. The prejudicial effect in this case was exacerbated because: (1) the evidence introduced had no probative value; (2) the State specifically identified it as a criminal offense; and (3) the State mentioned this extraneous offense during final argument. Here we have but one example of an accused being tried, not so much for a crime, as for being a criminal. This offends our system of justice. *See Wells*, 730 S.W.2d at 788. For all of the reasons stated, the admission of extraneous offense evidence was error.

This Court must reverse appellant's conviction, unless we determine beyond a reasonable doubt that the error made no contribution to his conviction or punishment. TEX.R.APP.P. 81(b)(2). The admission of improper evidence puts a heavy burden on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the error did not contribute to the conviction or the punishment assessed. *Foster v. State*, 687 S.W.2d 65, 66 (Tex.App.—Dallas 1985, pet. ref'd). We cannot say from the record before us that the State has met its heavy burden. Consequently, we reverse the judgment of the trial court and remand the cause for a new trial.

---

1. We are quite aware that exceptions to inadmissibility are often employed as a subterfuge for the admission of propensity type evidence. *See Boutwell*, 719 S.W.2d at 180; *Wells*, 730 S.W.2d at 786; *Garza v. State*, 632 S.W.2d 823, 829 (Tex.App.—Dallas 1982), *aff'd in part, rev'd in part*, 715 S.W.2d 642 (1986).