**AFFIRMED as MODIFIED and Opinion Filed July 12, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00002-CR**

**ALWAJID WAHID SHABAZZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 282nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F19-00616-S**

## MEMORANDUM OPINION

Before Justices Schenck, Reichek, and Carlyle
Opinion by Justice Reichek

A jury convicted Alwajid Wahid Shabazz of felony murder after he struck a teenage bicyclist with his vehicle, killing him on impact. The trial court assessed punishment, enhanced by two prior felony convictions, at seventy years in prison.

In four issues, appellant argues the trial court abused its discretion by denying his motion for continuance and erred by acting as "an adversarial advocate" against him instead of as a neutral and detached arbiter; the State violated his due process rights by making a "structured and intentionally misleading presentation" of the case; and the evidence is insufficient to support his conviction. In a cross-issue, the State asks that we correct numerous errors in the trial court's judgment. For reasons

set out below, we overrule appellant's issues, sustain the State's cross-issue, and modify the judgment to correct the errors. We affirm the trial court's judgment as modified.

## BACKGROUND

Shortly before 11 p.m. on October 10, 2018, fourteen-year-old Joseph Reyes Aguilar was riding his bicycle on Great Trinity Forest Way, a four-lane road divided by a median that connects Pleasant Grove to Oak Cliff in south Dallas. Aguilar, dressed in dark clothing, was eastbound in the left traffic lane within a few feet of the median when he was struck by a vehicle. He sustained multiple injuries and died on impact.

Investigating police officers arrested appellant at the scene on suspicion of driving while intoxicated and later charged him with felony murder after observing heavy damage to the front end of his Range Rover, the positioning of his vehicle in relation to the accident scene, his behavior at the scene, and his failure to pass field sobriety tests.

Among the witnesses at trial were three people who were driving on Great Trinity Forest Way that night and came upon the accident shortly after it happened: Juan Hurtado, Aunquinic Collins, and Edward Brown.

Hurtado testified he drove the road daily and often saw pedestrians and cyclists on it, daytime and nighttime. He was driving east in the left lane at about 10:48 p.m. when he saw a bicycle in the road with its tire still spinning. At first, he

–2–

thought someone had thrown a bike in the middle of the street. But then, a "good distance" away, he saw a body in the road. Although he said the area was dark, Hurtado said his headlights illuminated the road and he was paying attention and was able to swerve to avoid hitting the body. As he continued down the road, he saw a black Range Rover parked on the side of the road. The vehicle had heavy damage to the front and its radiator was "still smoking." Hurtado believed the vehicle had been involved in an accident. He called 911 and circled back around to the accident scene. He left the scene once the ambulance arrived.

Collins was also eastbound when she encountered slow traffic and saw bicycle parts in the street. After moving into the right lane, her son alerted her to a body on the roadway. Collins, who said the area was dimly lit, called out to the person, but he did not respond and was not moving. She also called 911 and made a U-turn to return to the area. While on the phone with 911, Collins saw two cars drive over the body. One car drove over the lower part of the body and the other drove over the head.

Like Hurtado and Collins, Brown was also eastbound in the left lane when he saw the body in the roadway and was able to avoid running over it. He pulled over and called 911. Brown noticed an SUV on the side of the road with the door open. The man asked to use his cellphone, and Brown let him. A woman then called Brown's phone wanting to speak to the man. The woman told Brown that the man's

vehicle airbag had deployed, leaving Brown to wonder "who did he hit" because airbags "just don't" deploy.

Within a few minutes of the 911 calls, paramedics arrived at the scene. They saw bicycle parts scattered on both the eastbound and westbound lanes, like the bicycle "exploded all over the road," and saw Aguilar lying on the eastbound lanes. He was motionless, not breathing, and had no pulse. There was a large amount of blood, and he appeared to have sustained multiple fractures and "massive trauma" to the neck and back from "an incredible amount of force." They determined he was dead.

As paramedics surveyed the accident scene, they noticed the SUV a quarter-mile down the road and suspected it may have been involved in the accident. Kevin Parker, who was a firefighter and a paramedic-in-training, went to investigate to determine if anyone was injured. Parker said the driver's door was open, and he could see that the airbag had deployed. The driver, who he identified as appellant, was standing outside eating chips.

Parker asked appellant if he had any injuries, but appellant did not answer his question. Rather, appellant started talking about "how there was a curve in the road" and how he "couldn't see around the curve." Parker, however, said the road was "perfectly straight." He believed appellant was trying to "deflect" or "excuse" his responsibility because "he couldn't' see around a curve" that actually was not there.

—4—

Parker then noticed "just how much damage" there was to the front of appellant's vehicle. The damage indicated to him that the SUV had been traveling at a high rate of speed when it hit the child. Appellant, however, did not appear to be injured and was walking around "like nothing had just happened." Parker told appellant he had hit and killed someone, and appellant just reiterated that "he couldn't see." Parker suspected appellant was intoxicated because he was not cooperative with his questions, was trying to eat something to either sober up or mask the odor of alcohol, and had shown no remorse for what had happened. Parker also said that when a sober person takes "an airbag to the face," he is generally stunned at least momentarily and will stay in the car until help arrives. Appellant, on the other hand, was walking around. Parker also explained that alcohol can make a person feel relaxed or sedated such that he will not tense up in anticipation of a crash, unlike a sober person, so "they're much less susceptible to injuries because they are more fluid."

When Senior Cpl. Brian Crenshaw of the Dallas Police Department arrived on the scene at 11:11 p.m., paramedics informed him that they believed the driver involved in the crash was intoxicated. Crenshaw approached appellant and detected the odor of alcohol on his breath and noticed he had slurred speech. He also saw that appellant was eating chips. Crenshaw asked appellant what happened, and appellant said that he "never saw him" and mentioned "coming around a bend." Crenshaw suspected appellant was intoxicated, and per standard procedure, called

–5–

for a DWI officer to come to the scene to conduct a DWI investigation. While waiting, he placed appellant in a squad car. An accident investigator was also called to the scene since it was a traffic fatality.

The DWI officer, Jeffers,[1] arrived less than twenty minutes after being called, interviewed appellant, and conducted field sobriety tests, which appellant failed. The interaction was captured on video, which was shown to jurors. The officer determined appellant was intoxicated, and appellant was handcuffed and placed in a squad car. Appellant refused to provide a breath or blood specimen, so the officers began work to obtain a warrant. Once the accident reconstruction officer completed his investigation, Crenshaw transported appellant to the hospital to obtain a blood sample. Crenshaw had to wait until the warrant arrived, and appellant's blood was eventually drawn at 2:45 a.m., approximately four hours after the accident.

Crenshaw was with appellant from the time he approached him at the scene until his blood was drawn, and body cam or in-squad car recordings were offered to show appellant's actions during that time. The recordings showed appellant falling asleep numerous times, and, as Crenshaw testified, appellant was sound asleep just fifteen or twenty minutes after the accident and before the DWI investigator arrived. Appellant also moved slowly and spoke slowly. Using the recordings, Crenshaw

---

[1] The first name of this officer was not given at trial.

pointed out these were signs of intoxication which he believed showed that appellant had lost the use of his normal mental and physical faculties.

A crime scene analyst photographed the scene and, among the debris, found a shoe in the eastbound lane, a shoe in the westbound, and one sock. She also photographed appellant's vehicle, which showed the ignition in the "on position" and the car was "in drive" mode, indicating the car stopped on its own.

Senior Cpl. Marc Johnson, an accident investigator with the traffic division, documented all of the pieces of evidence at the crash scene and later generated a detailed scene evidence map. Johnson explained to jurors what he observed at the scene and how he believed the accident occurred.

Johnson said there was "a lot of evidence" on the roadway, and he was able to determine the area where the vehicle hit the bicycle. The first gouge mark caused by a portion of the bicycle hitting the roadway was located in the left lane of traffic close to the median. He also observed two pools of blood a few feet apart on the roadway. Johnson determined that the first pool of blood marked where Aguilar landed after being thrown from his bicycle; the second pool of blood marked his final resting place. Using the distance between the first gouge mark and the first pool of blood, 225 feet, he calculated appellant's range of speed when he hit Aguilar at between 59 and 71 mph. The posted speed limit was 50 mph. Johnson testified it was not prudent to go 9 to 21 miles over the speed limit in dark conditions on a road like this because the purpose of speed limits is to give a "safe speed that is reasonable

and prudent for that roadway given any conditions likely to exist." He explained that when a person exceeds that limit, it removes the "advantage" to be able to react to dangers. Here, he agreed, the vehicle was going "pretty fast" and it would have been "very difficult" to see Aguilar riding his bicycle. But, he said any increase in speed increases stopping distance and shortens the time to react to hazards.

Johnson said, in this crash, the bicycle went underneath the vehicle when it was hit and was "just destroyed." He also observed the damage to appellant's vehicle and noted it was consistent with the rest of the debris he observed at the crash site. Johnson testified that lower damage to the vehicle was evidence of impact of the bicycle, while the significant damage to the hood and windshield is where Aguilar came off the bicycle and was physically struck by the vehicle.

Based on his investigation, observation of the debris, and damage to the vehicle, Johnson determined that appellant's vehicle was the first vehicle to make contact with Aguilar. Using photographs, he explained a tire mark on appellant's front bumper was the height of a bicycle tire in a vertical position, indicating that the bicycle was being ridden when struck by appellant's vehicle. Evidence indicated that Aguilar was riding on the left side of the left traffic lane within a few feet of the center median when appellant hit him with the left front corner as he was driving in the left lane. Johnson testified that, at 59 to 71 mph, it would not have taken "much steering input to swerve" to avoid impact, but there was no scuff, skid, or tire mark to indicate appellant swerved or braked to avoid Aguilar. He believed it would have

been "fairly easy" to take evasive action, given that "Aguilar is literally on the driver's side corner of the vehicle." Johnson explained that distraction, inattentiveness, and impairment are some of the reasons a driver may not take proper evasive action. While he acknowledged that the roadway was dark and the victim was wearing dark clothing, he nevertheless maintained that evasive action could have been taken to prevent the collision in this case. Based on his investigation, he concluded that appellant's vehicle was the vehicle that caused Aguilar's death. On cross-examination, he testified that reflectors were only on the foot pedals, even though they were required to be in other places on the bicycle.

Heidi Christensen, a toxicology chemist at SWIFS, tested appellant's blood specimen and found the presence of drugs and alcohol. She testified the following substances were in appellant's blood: 0.10 milligrams per liter of diphenhydramine (Benadryl); 0.093 milligrams per liter of alprazolam (Xanax); and 0.058 grams of alcohol per 100 milliliters of blood. He tested negative for cocaine and opiates.

Christensen calculated what appellant's alcohol concentration would have been at the time the crash occurred, given his weight and gender, and estimated it would have been between 0.09 and 0.17. Christensen doubted the accuracy of appellant's claim to police that the last alcoholic beverage he consumed was two eight-ounce cans of Coors Light beer some 28 hours before the crash, saying that scenario "would not be consistent" with the 0.058 test result.

Senior Cpl. Joshua Boykin, a drug recognition expert and Intoxilyzer operator, reviewed the body-cam footage, toxicology report, and police report in this case and also concluded appellant was intoxicated that night. Boykin, who has responded to numerous crash scenes and has investigated thousands of possibly intoxicated drivers, explained that the substances in appellant's bloodstream—alcohol, Xanax, and Benadryl—were all central nervous system (CNS) depressants and combined cause a strain on the body. A person with a CNS depressant would exhibit drug-like behavior, drowsiness, slow slurred speech, thick tongue, relaxed inhibitions and judgment. When there are multiple CNS depressants present, as in the case, the effects are multiplied and amplified. Boykin said appellant exhibited all of these signs on the videos, which indicated he had lost the normal use or mental and physical faculties.

Finally, Boykin was asked, based on his training and experience, about the "emotional response" of people who have been involved in a crash and were not intoxicated. He said the "normal response" is the person has a "heightened response" and is "talkative, concerned about what's going on" and has an "overall awareness of the situation." In contrast, an intoxicated person who has CNS depressants in his system lacks emotion and has "no remorse or even questions about what else may be involved or the other person involved" and is "just kind of carefree." He explained that the person's body is "generally depressed" due to the intoxicant, and his focus is generally only on himself.

The morning following the crash, Dr. Elizabeth Ventura performed an autopsy on Aguilar's body. She detailed for the jury the multiple injuries that Aguilar sustained. Externally, he sustained lacerations and abrasions all over his body. Internally, his atlanto-occipital joint, which is the joint connecting his neck to the base of his skull, was dislocated; his upper cervical spinal cord was separated from the brain; and his spinal column in the mid-chest region was completely transected. His esophagus, larynx, and ascending aorta were also completely transected. Many of his organs were lacerated, and his pelvis was fractured. Ventura concluded the cause of death was blunt force injuries.

Ventura opined that the first vehicle that hit Aguilar was the one that killed him because he had specific acceleration/deceleration injuries, such as the transection of his ascending aorta and the dislocation of his atlanto-occipital joint, that are typically seen in individuals who are hit at a high rate of speed. When the aorta was transected, there was no way for blood to get from Aguilar's heart to his other organs; when his atlanto-occipital joint was dislocated and caused complete separation of his spinal cord, Aguilar would have "had no association with breathing." Either injury would have caused immediate death. So, if Aguilar was hit while on the road by one or more cars, he was already dead on impact from the first vehicle, she said.

In addition to the police and medical testimony, the State also offered evidence of a series of jail calls made by appellant to his girlfriend, Cherish

–11–

Williams, the day after the accident. In the calls, appellant told Williams he threw out his license plate and a box of stuff from the vehicle on the side of the road, and he told her to go back to the scene of the fatality crash and get the items for him. At one point, appellant told Williams, "I should have just kept going." In another call, Williams confirmed she found the license plate and other items. The two discussed the items using the terms "girl" and "grass," which evidence showed were slang names for cocaine and marijuana. Williams told appellant that the "white bag is busted," and appellant told her to "preserve what you can." In the calls, Williams reminds appellant to be discreet because the lines are recorded. When Williams was called to testify at trial about what she recovered for appellant at the scene, she invoked her Fifth Amendment rights.

After hearing the evidence, the jury found appellant guilty of felony murder and further found he used or exhibited a deadly weapon, i.e., a motor vehicle. Appellant elected for the trial court to assess punishment. After hearing the evidence, the trial court assessed punishment, enhanced by two prior felony convictions, at seventy years in prison. This appeal followed.

## SUFFICIENCY OF EVIDENCE

In his third issue, appellant contends the evidence is insufficient to support his conviction.

In reviewing a challenge to the sufficiency of the evidence, we consider all evidence in the light most favorable to the verdict and determine whether, based on

that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Clayton v. State*, 235 S.W.3d 772,778 (Tex. Crim. App. 2007). We may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). However, we must ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged. *Id*.

A person commits murder, as charged here, if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(3). An offense under this section is commonly referred to as "felony murder." Here, the underlying felony offense alleged was felony DWI. *See id*. §§ 49.04(a), 49.09(b)(2); *see also Lomax v. State*, 233 S.W.3d 302, 309–10 (Tex. Crim. App. 2007) (concluding felony DWI can be the underlying felony in a "felony murder" prosecution).

The jury was authorized to convict appellant of murder if it found he committed the felony offense of DWI 3rd, and while in the course of and furtherance of the commission of DWI 3rd, he committed an act clearly dangerous to human life and thereby caused the death of Aguilar. The acts alleged were (1) operating a motor vehicle while intoxicated or under the influence of drugs, or (2) driving at a speed in excess of the posted speed limit, or (3) driving a speed not prudent for conditions then existing, or (4) driving while failing to keep a proper lookout, or (5) failing to apply the brakes to avoid a collision, or (6) causing the motor vehicle operated by said defendant to strike Aguilar.

As set out above, the evidence showed appellant's vehicle was the first vehicle to strike Aguilar. At the time, appellant was traveling between 59 and 71 mph, which was over the posted speed limit of 50 mph. Aguilar was killed on impact. Appellant's vehicle, heavily damaged, was a quarter-mile away. The airbag had deployed, the ignition was in the "on position," and the car was in "drive" mode, indicating it had stopped on its own. From the evidence at the scene, Cpl. Johnson, the accident reconstructionist, explained in detail how he believed the accident occurred, why he believed it was appellant's vehicle that first hit Aguilar, and why he believed that was the vehicle that caused his death. He said that, given where Aguilar was riding at the time he was hit and the portion of appellant's vehicle that struck him, appellant could have prevented the collision by taking the slightest

amount of evasive action, but there was no evidence on the roadway that appellant had swerved or braked before he hit Aguilar.

The medical examiner testified about Aguilar's many injuries and explained that two (dislocation of his atlanto-occipital joint and transection of his aorta) were rapid acceleration/deceleration injuries typically seen when someone is hit at a high rate of speed. Both injuries would have caused his immediate death. The medical examiner believed the first vehicle that struck Aguilar was the one that killed him.

Investigators at the scene testified they believed appellant was intoxicated and had lost the use of his normal and physical faculties. They identified a number of signs to support their conclusion, including appellant's actions at the scene, the smell of alcohol on his breath, his slurred speech, his performance on the field sobriety tests, and his implausible explanation that, despite the road being straight, he did not see Aguilar because there was a bend or curve in the road. In addition, appellant's blood tested for the presence of multiple CNS depressants (alcohol, diphenhydramine, and alprazolam), causing a slower reaction time, poor divided attention, and possible impairment of coordination.

On appeal, appellant does not challenge whether he was intoxicated or that he struck Aguilar with his vehicle. Rather, he contends Aguilar died as a result of the limited visibility, not the dangerous acts alleged in the indictment. In particular, he argues the evidence showed that Aguilar was dressed in dark clothing, his bike was a dark color and did not have reflectors visible to someone traveling behind, and the

–15–

area was dark. He also notes that one of the motorists failed to see Aguilar and was instead alerted by her son that the body was in the roadway, and that two other motorists hit Aguilar's body in the roadway.

But Johnson testified to the contrary. He testified that if a vehicle's headlights are operating, even with no streetlights, the driver can see at least some distance in front of him. He said, in his opinion, that if someone were traveling the speed limit or below, even in the level of darkness at the scene, he could have taken evasive action to avoid the collision. In this case, he said it would have been "fairly easy" to take evasive action, given the positions of the SUV and bicycle just before the collision. Moreover, despite the limited visibility testified to by other witnesses, other drivers who came upon the scene just after it happened were able to see Aguilar's body in the roadway and avoid hitting it. Hurtado, for example, testified that the area was dark, but that he saw the bicycle and body because he had his headlights on and was paying attention to the road.

Having reviewed all the evidence in the light most favorable to the verdict, we conclude a rational jury could have found beyond a reasonable doubt that appellant was guilty of murder as charged in this case; therefore, the evidence is legally sufficient to support the conviction. We overrule the third issue.

## MOTION FOR CONTINUANCE

In his first issue, appellant contends the trial court erred by denying his motion for continuance.

On the first day of trial, before voir dire began, the State filed an amended witness list. The list added Cherish Williams, appellant's girlfriend, who went to the crash scene to collect items appellant threw from his vehicle that night. Appellant objected to her testimony on the grounds of surprise and prejudice, arguing he had not had the opportunity to investigate her, attempt to contact her, or prepare to cross-examine her. The State responded that it provided notice of the content of Williams's testimony at least a month before trial through the disclosure of the jail calls and notice of extraneous offenses. The trial court denied the continuance.

To obtain reversal based on a denied continuance, appellant must show that the denial was erroneous and that it caused actual and specific prejudice to his defense. *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010); *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006). This requires a showing that "the case made for delay was so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State outweighed the defendant's interest in delay of the trial. *Gonzales*, 304 S.W.3d at 843 (quoting George E. Dix & Robert O. Dawson, 42 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 28.56 (2d ed. 2001)); *Martinez v. State*, No. 05-19-01549-CR, 2021 WL 1608496, at *3 (Tex. App.—Dallas Apr. 26, 2021, no pet.) (mem. op., not designated for publication). The record must also show "with considerable specificity how the defendant was harmed by the absence of more

–17–

preparation time than he actually had." *Id*. (quoting Dix et al., *supra*); *Martinez*, 2021 WL 1608496, at *3.

On appeal, appellant argues that having been deprived of an opportunity to investigate Williams, he was left "with having no cross-examination of Williams" and suffered prejudice by that inability.

Initially, we note the record does not support any suggestion by appellant that he was unfairly surprised by the addition of Williams to the witness list. As the State explained, appellant had notice of the content of Williams's testimony through the disclosure of the jail calls and notice of extraneous offenses. And, as Williams was appellant's girlfriend, appellant presumably had access to her and could have discussed the content of her testimony at any time.

Moreover, at trial, Williams testified only to her name, date of birth, phone number, and the fact that she knew appellant. When the State asked her what she retrieved at the crime scene the next day at appellant's request, she asserted her Fifth Amendment privilege against self-incrimination in front of the jury.[2] The State did not ask additional questions, and Williams was dismissed. Appellant does not explain what he would have asked Williams on cross-examination, given that she refused to provide any substantive testimony, or how he was actually prejudiced by

---

[2] Williams announced her intent to assert her Fifth Amendment privilege after the trial court ruled on the continuance motion. Appellant objected to the invocation being made in the jury's presence, and the trial court overruled the objection.

–18–

the lack of additional preparation time.  To the extent he asserts he was prejudiced by Williams' assertion of her Fifth Amendment rights in front of the jury, he does not explain how this is connected to the denial of his continuance much less how he was actually prejudiced in the context of that denial.  Because appellant has not shown that that the lack of a continuance prejudiced his defense, we overrule the first issue.

### STATE'S PRESENTATION OF CASE

In his second issue, appellant asserts the State violated his due process rights by making a "structured and intentionally misleading presentation" of the case. Specifically, appellant complains that the State did not call Jeffers, the DWI officer who administered the field sobriety tests to appellant and secured the warrant. According to appellant, Jeffers had concluded that he should be charged with only felony DWI and that he was not responsible for Aguilar's death.  Appellant asserts that the State did not call Jeffers because his testimony would have conflicted with its "carefully constructed narrative" that appellant was charged with killing Aguilar "based on the collective opinion of the police officers who had investigated the matter."

Even if we assume the State's decision not to call one of the police officers in this case could implicate appellant's due process rights, there is no evidence in the record to support the underlying premise of appellant's claim—that Jeffers concluded that appellant should be charged only with felony DWI and that he was

not responsible for Aguilar's death.  As a basis for those assertions, appellant relies on the substance of questions propounded to another officer, Cpl. Johnson.  But Johnson testified he was "not aware" of the charges contained in the police report and did not know what appellant was charged with on the night of his arrest.  When asked if he was aware of "Officer Jeffers' conclusion as to Mr. Shabazz not being responsible for the death of the individual," the State's hearsay objection was sustained and thus Johnson did not answer the question.

Nevertheless, appellant argues on appeal that the question itself can establish the "substantive matter for purposes of appellate review" because the "State never disputed the substantive content."  As legal authority, he relies on cases in which the court considered uncontroverted, unobjected-to statements of counsel about *occurrences in the courtroom* as evidence of those occurrences on appeal.  *See Thieleman v. State*, 187 S.W.3d 455, 457–58 (Tex. Crim. App. 2005) (explaining legal principle in context of defendant's motion for mistrial because of purportedly sleeping juror); *Yarborough v. State*, 947 S.W.2d 892 (Tex. Crim. App. 1997) (prosecutor's unchallenged statement about venire member's demeanor can support finding in *Batson* hearing);  *Pitts v. State*, 916 S.W.2d 507, 510 (Tex. Crim. App. 1996) (accepting as true that exhibit was defendant's written judicial confession when counsel did not object when it was characterized as such or object to its admission into evidence); *Hicks v. State*, 525 S.W.2d 177, 179 (Tex. Crim. App. 1975) (accepting defense counsel statement describing prosecutor's physical actions

–20–

during improper argument when statement was undisputed by prosecutor and was unquestioned or unqualified by trial court).

Here, appellant is not attempting to apply the law to a *Batson* complaint, mistrial, judicial confession, or other similar occurrence in the courtroom; rather, he is attempting to use, as substantive evidence, the content of a question asked of a witness during the trial as evidence to support his issue on appeal. But the law is well settled that questions asked by trial counsel are not evidence. *See Madden v. State*, 242 S.W.3d 504, 509–10 (Tex. Crim. App. 2007) (recognizing that questions posed by attorney are not evidence); *Wiggins v. State*, 778 S.W.2d 877, 890 (Tex. App.—Dallas 1989, pet. ref'd) ("[A]nswers, not questions, constitute evidence[.]"); *Wells v. State*, 730 S.W.2d 782, 786 (Tex. App.—Dallas 1987, pet. ref'd) ("Questions put to a witness are not evidence."). Because the underlying factual basis for appellant's complain is not supported by the record, we conclude he has not shown error. We overrule the second issue.

### TRIAL COURT BIAS

In his fourth issue, appellant contends the trial court violated his due process rights by being biased against him and acting as an advocate against him. He identifies three areas in which he contends the court failed to act impartially: (1) by acting "antagonistic" when denying his motion for continuance, (2) by "telling the State how to better present its case" during Hurtado's testimony, and (3) by "facilitating the State's use of an inadmissible Fifth Amendment invocation" during

Williams's testimony. Appellant argues the cumulative impact of the trial court's "bias/adversarial advocacy" entitles him to a reversal of his conviction.

Due process requires a neutral and detached judge. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006). A defendant is entitled to a fair trial before a judge with no actual bias against him or interest in the outcome of his particular case. *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997). Accordingly, a judge should not act as an advocate or adversary for any party. *Dockstader v. State*, 233 S.W.3d 98, 108 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).

To reverse a judgment on the ground of improper conduct or comments of the judge, we must find (1) that judicial impropriety was in fact committed, and (2) probable prejudice to the complaining party. *Id*. Judicial remarks during the course of a trial that are critical, disapproving, or even hostile to counsel, the parties, or their cases ordinarily do not support a bias or partiality challenge. *Id*. Such remarks may constitute bias if they reveal an opinion deriving from an extrajudicial source. *Id*. When no extrajudicial source is alleged, however, such remarks will constitute bias only if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. *Id*. Normal expressions of impatience, dissatisfaction, annoyance, and even anger do not establish bias or partiality. *Liteky v. U.S.*, 510 U.S. 540, 555–56 (1994). "A judge's ordinary efforts at courtroom administration —even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id*. at 556.

## A. Motion for Continuance

Appellant first argues the trial court was "antagonistic" to him when he presented his motion for continuance. In particular, he directs us to the following exchange:

> [TRIAL JUDGE]: . . . So I will see you-all back tomorrow at 8:15. We're gonna start as close to 8:30 as possible.
>
> Do you-all have any questions?
>
> [PROSECUTOR]: No, Your Honor.
>
> [TRIAL JUDGE]: Defense?
>
> [DEFENSE COUNSEL]: Uh, not on what the Court said. I did want to say that I have a motion or [sic] continuance, Your Honor.
>
> [TRIAL JUDGE]: Uh, you answered ready the other day. We're engaged in trial. What - - - what - - and you know I don't entertain oral motions. You have to file them per Chapter 29. Do you have one for me?

Defense counsel stated he did and, after making his argument, the following occurred:

> [TRIAL JUDGE]: All right. Counsel, can you point me to a portion of the code that says you needed X amount of notice prior to jury selection?
>
> [DEFENSE COUNSEL]: Uh, well, Judge, I can say that the Court, uh, held a pretrial, and I believe ordered this type of information to be provided in a timely fashion.
>
> [TRIAL JUDGE]: So what's my answer to my question?
>
> [DEFENSE COUNSEL]: Uh, the answer to your question is no, I can't provide you with a specific code provision, uh, in that regard.
>
> [TRIAL JUDGE]: Okay. So you're not saying that 39.14 anywhere requires them to give it to you prior to today?

[DEFENSE COUNSEL]: Uh, yeah, I'm sorry.

Uh, 39.14, I believe, Judge, uh, does require that this be provided before today.

[TRIAL JUDGE]: What subsection?

[PROSECUTOR]: Your Honor, may I respond [while] counsel is searching for the code section?

[TRIAL JUDGE]: Let's let him so that you can have just one response.

After addressing an unrelated matter, the court returned to the issue of counsel's

continuance:

[TRIAL JUDGE]: Okay. I would assume that the motion for continuance says - - nope it doesn't.

So you-all, it's - - uh, it's 5:32. What's the code sections that we're talking about?

Defense, what's the code section that we're talking about?

[DEFENSE COUNSEL]: Well, Judge, I'm simply citing 39.14. And I'm not citing the Court to a particular subsection of 39.14.

[TRIAL JUDGE]: It's got - - it goes all the way from A to N. You're not citing anything?

[DEFENSE COUNSEL]: I'm citing it in its entirety, respectfully, Your Honor.

[TRIAL JUDGE]: Okay. State, your response?

After hearing the State's response, the trial court denied the motion, at which point the following occurred:

[DEFENSE COUNSEL]: Uh, Judge, I had asked to make a record of some additional information.

[TRIAL JUDGE]: I gave you an opportunity to make your arguments about the motion for continuance, so that's denied.

If you want to talk about something else other than the motion for continuance.

[DEFENSE COUNSEL]: Judge, I asked for an opportunity to say some other things for the record.

[TRIAL JUDGE]: What are your other arguments, Counsel?

I've already ruled.

[DEFENSE COUNSEL]: But - - right. And I understand that, Judge. But I simply wanted to, uh, say something, and it is indeed argument as to, uh, the motion for continuance.

Defense counsel then made additional comments.

Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *Liteky*, 510 U.S. at 555. They "can only in the rarest of circumstances evidence the degree of favoritism or antagonism required" to make a fair judgment impossible." *Id*. Further, bias or prejudice is something more than an unfavorable ruling and must "connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . . , or because it is excessive in degree." *Id*.

Here, the trial court acted within its discretion in denying appellant's motion for continuance. As previously explained, appellant had notice of Williams as a potential witness and the content of her testimony through the State's disclosure of the jail calls and notice of extraneous offenses. Although appellant characterizes the judge's conduct and demeanor as antagonistic, we cannot agree. At best, the judge

expressed some impatience or annoyance, which does not establish judicial bias. *See id.* at 555–56.

## 2. Assisting the State

Appellant next complains that the trial judge advised the State how to better present its case.

During Hurtado's testimony, the State sought to admit the 911 recording of his call made upon seeing Aguilar's body. Appellant objected on hearsay grounds. The trial court removed the jury and took a brief break. After the break, during a hearing outside the jury's presence was held, the State argued the 911 call was admissible as a present sense impression and excited utterance, both exceptions to the hearsay rule.

The judge directed the prosecutor to "get the witness back on the stand" and ask him about the "proximity to him seeing the body and making the call." The State did as directed. Hurtado testified that he made the 911 call within seconds of seeing the body in the roadway. The trial court then ruled the exhibit was admissible.

Appellant argues that while the trial court could have offered "generalized and neutral commentary" informing the State that Hurtado could be questioned to show the call was admissible, the court here improperly provided "guidance" on the presentation of the State's case.

A trial judge has broad discretion in maintaining control of the courtroom and expediting a trial. *Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001). A

judge can lawfully provide guidance and manage presentation of evidence from the bench without abandoning her rule as an independent arbiter. *Strong v. State*, 138 S.W.3d 546, 552 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.).

Here, the trial judge did nothing more than keep the trial moving efficiently by directing the prosecutor to address the information she needed to make a ruling on appellant's hearsay objection and the exceptions asserted by the State. Nothing in her remarks suggest any bias or display any unfairness to the defendant.

### 3. Williams's Fifth Amendment Invocation

Before Williams testified before the jury, the trial court appointed counsel to represent her, and counsel informed the court that Williams would invoke her Fifth Amendment privilege regarding going to the scene and retrieving the items appellant threw from his vehicle. At that point, appellant objected "to any further proceeding." The trial court overruled the objection, and Williams took the stand. When she was asked about returning to the scene, Williams invoked her Fifth Amendment privilege in front of the jury.

Appellant argues the law generally prohibits allowing jurors to see an invocation of a Fifth Amendment privilege. *See Coffey v. State*, 796 S.W.2d 175, 178 (Tex. Crim. App. 1990). He argues the trial court's ruling violated this law and demonstrated not only bias, but that it was "functioning as an adjunct State's advocate."

Appellant has presented no independent issues on appeal assigning error to this ruling. We have previously concluded that the remedy for alleged unfair rulings is to assign error to the ruling itself rather than to complain of bias. *See McDaniel v. State*, 05-15-01086-CR, 2016 WL 7473902, at *11 (Tex. App.—Dallas Dec. 29, 2016, pet. ref'd) (mem. op., not designated for publication). Moreover, as previously explained, bias almost never can be shown based on the judge's rulings in the case. *See Liteky*, 510 U.S. at 555.

With respect to appellant's assertion that he is entitled to relief based on the cumulative impact of the alleged instances of bias, we have found against him on each of his complaints. Therefore, there are no instances of bias to cumulate. We overrule the fourth issue.

### STATE'S CROSS-ISSUE

In a cross-issue, the State identifies the following errors in the judgment and requests we correct them: (1) it states the jury assessed punishment; (2) it lists the statute under which appellant was convicted as section 19.02(a)(1); and (3) it states "N/A" on the pleas and findings on the two enhancement paragraphs alleged in the indictment. Having reviewed the record, we agree.

The record shows appellant was indicted on a charge of felony murder under section 19.02(b)(3) of the penal code, and the jury found him guilty of the charge. The trial court released the jury after accepting its verdict and then heard evidence

on punishment. At the conclusion of the evidence, the trial court found the two enhancement paragraphs true and assessed punishment.

We have the power to modify an incorrect judgment to make the record speak the truth when we have the necessary information to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd).

We sustain the State's cross-issue. We modify the judgment to correct the errors.

We affirm the judgment as modified.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
200002F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ALWAJID WAHID SHABAZZ,
Appellant

No. 05-20-00002-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 282nd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. F19-00616-S.
Opinion delivered by Justice
Reichek; Justices Schenck and
Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

(1) To state "Trial Court" under heading "Punishment Assessed by";
(2) To state "19.02(b)(3) Penal Code" under heading "Statute for Offense";
(3) To state "Not True" under headings "1st Enhancement Paragraph" and "2nd Enhancement Paragraph"; and
(4) To state "True" under headings "Findings on 1st Enhancement Paragraph" and "Findings on 2nd Enhancement Paragraph."

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered July 12, 2021