

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00017-CR

———————————————

BRADLEY DWAYNE HUMPHREY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from County Criminal Court No. 2
Tarrant County, Texas
Trial Court No. 1587393

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. Introduction

The jury convicted Appellant Bradley Dwayne Humphrey of driving while intoxicated. In three points, Humphrey argues that jury-charge error and improper jury argument require this court to reverse his conviction. Because the record does not reveal the harm required for reversal for jury-charge error and Humphrey did not preserve his jury argument complaint, we affirm.

## II. Background

On the night of November 15, 2018, Humphrey took etizolam, a benzodiazepine that cannot be legally prescribed in the United States. When he woke up the next morning—and while the etizolam was still in his system—he took hydrocodone, an opiate for which he has a prescription. Humphrey then went through his normal morning routine, got in his pickup truck, and began his drive to work. On the way, he was involved in a traffic accident. A police officer investigating the accident asked Humphrey to perform field sobriety tests. Based on Humphrey's performance of those tests, he was arrested for driving while intoxicated. He was subsequently charged by information for that offense.

At trial, Dallas/Fort Worth International Airport Police Sergeant Ryan Gresham testified about his roadside investigation of Humphrey for DWI. Gresham testified that when he spoke to Humphrey, Humphrey's words were slurred and that he seemed to have degraded fine motor skills. Based on Humphrey's demeanor,

Gresham asked him to perform field sobriety tests. With Humphrey's consent, Gresham administered the horizontal-gaze-nystagmus test (which Humphrey was unable to perform), the walk-and-turn test, and the one-legged stand test, and, according to Gresham, these tests indicated that Humphrey was impaired. The jury members saw for themselves Humphrey's performance on these tests through footage from Gresham's body camera and his dash camera.

Gresham testified that he initially thought that Humphrey was intoxicated by alcohol because he detected what smelled like alcohol on Humphrey's breath, but Humphrey explained that he had recently used mouthwash, and Gresham found mouthwash in Humphrey's truck. An intoxilyzer test conducted after Humphrey's arrest did not detect any alcohol in Humphrey's breath. But Gresham asked for and obtained a sample of Humphrey's blood, which tested positive for both hydrocodone and etizolam.

Dr. Robert Johnson, chief toxicologist at the Tarrant County Medical Examiner's Office, testified for the State to explain the results of Humphrey's blood test. Johnson told the jury that etizolam is a benzodiazepine like Valium and Xanax. He explained that benzodiazepines are central-nervous-system depressants and that all drugs in that class can cause side effects similar to those caused by alcohol: "drowsiness, dizziness, confusion, [and] horizontal gaze nystagmus, where the eyes don't move smoothly from left to right." And, like alcohol, they can cause short-term

memory loss. Johnson stated that etizolam is more potent than Xanax and Valium—"on the potency scale, it's pretty high up there."

As for the hydrocodone, Johnson testified that it is an opiate that causes depressant-like side effects. Johnson acknowledged that the amount of hydrocodone in Humphrey's blood was within the therapeutic range. But he testified that when combined with etizolam, "[t]he combination could be significant because anytime you combine two drugs that cause similar side effects, those side effects can be multiplied. So if you use one thing that causes drowsiness and you add something else that also causes drowsiness, that effect could be multiplied." He agreed that combining the two drugs could affect someone's balance, ability to speak, and fine motor skills and could cause confusion. Johnson also agreed, however, that people can build up a tolerance to the drugs.

Humphrey testified in his own defense. He stated that on the morning of his arrest, he woke up, took the hydrocodone and a cyclobenzaprine,[1] and drank "two or three five-hour energies" because he is "not really a morning person." Humphrey claimed that because he had previously taken etizolam for several years—before it became illegal to prescribe—he had built up a tolerance to it. He testified that he started taking medication for pain around December 2017 after he woke up one day with five fractured thoracic vertebrae. He told the jury that he had no explanation for

---

[1]Cyclobenzaprine is a muscle relaxant. *See* Jane C. Ballantyne, Scott M. Fishman, James P. Rathmell, Bonica's Management of Pain ch. 80 (5th. ed. 2018).

4

how he had been injured, but he also told the jury about having bouts of memory loss; he gave as an example a time when he went to Sam's Club to shop and then woke up in jail, having "apparently . . . decided it was okay to light a cigarette up in Sam's Club." Regarding the day of his arrest, he stated that on the way to work, "he had gotten into what, at the moment, seemed like a very insignificant accident," "[j]ust kind of a paint-splat kind of scenario," and the last thing he remembered was getting out of his car and writing down his insurance information. The next memory he had was being in a jail cell the following morning.

In Humphrey's defense, he produced medical records from the neurologist who he sought treatment from after his arrest. He relied on the records to show that he had a pre-existing head injury that explained his signs of intoxication. He told the jury that he had been diagnosed with chronic traumatic encephalopathy, and he suggested to the jury that his condition may have resulted from multiple concussions that he received playing football in junior high and high school. After the prosecutor noted that his medical records did not contain that diagnosis and that chronic traumatic encephalopathy is a "postmortem diagnosis"—that is, diagnosed via autopsy after death—Humphrey pointed to a part of the records in which he was diagnosed with "[e]ncephalopathy, chronic." No testimony, expert or otherwise, explained what the difference is, if any, between chronic traumatic encephalopathy and chronic encephalopathy. No testimony explained whether those conditions could cause the intoxication-like signs that Humphrey displayed on the day of his arrest.

5

The closest evidence on that point came from the toxicologist's statement that, although he is "not an expert in that medical side of things," he "would assume [it was] possible" for someone with a head injury to display signs of intoxication.

The prosecutor asked Humphrey about the fact that his records stated that, based on the results of an MRI Humphrey's doctor had ordered performed after the car accident, "[t]here [wa]s no evidence of acute intracranial abnormality or brain parenchymal lesion or mass effect or hydrocephalus or extra-axial collection," to which Humphrey replied only that the doctor who made those statements also diagnosed him with chronic traumatic encephalopathy. No testimony explained what the terms meant or how they related to Humphrey's ability to perform field sobriety tests on the day of his arrest.

The prosecutor also asked Humphrey about a doctor's note in his records regarding his November 2018 arrest:

> Of note, [Humphrey] reports [a]n episode where he suffered amnesia attack and "ended up in Grapevine Jail." He reports "waking up with track marks" upon awakening and believes this is due to staff obtaining lab work. *He is requesting a "note for his prosecutor" that indicates he is suffering from "epilepsy."* He uses this word exactly despite his noted diagnoses of disorientation and post-traumatic amnesia . . . . EEG on 11/29/18 was normal. This was not his first event and notes four other similar episodes where he lost consciousness of 7–24 hours. [Emphasis added.]

Humphrey disputed the note and said that he had not asked the doctor to provide him with an epilepsy diagnosis for purposes of his criminal case. He explained the note by saying that he had mentioned epilepsy as "a quest to basically find out" why

6

he had woken up in December 2017 with spinal fractures with no idea how those fractures had occurred.

After Humphrey acknowledged that he was "impaired in some way" in the video the jury saw of his field sobriety tests, his attorney asked him,

Q. You shouldn't have been driving after the accident, right?

A. Absolutely.

Q. Because you probably hit your head, right?

A. That's correct.

This testimony was the only evidence that Humphrey had possibly hit his head in the apparently minor traffic accident that led to his arrest; in closing arguments, however, his attorney argued that during the accident, he suffered another concussion.

At the jury charge conference, Humphrey's attorney objected to a paragraph in the proposed charge defining the term "controlled substance." The trial court overruled that objection, and Humphrey's attorney made no other objections. The jury charge thus instructed that

> "Intoxicated" means not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body.

> "Controlled substance" means a substance, including a drug, an adulterant, and a dilutant, listed in Schedules I through V or Penalty Groups 1, 1-A, or 2 through 4. The term includes the aggregate weight of any mixture, solution, or other substance containing a controlled substance.

The trial court found Humphrey guilty, and the trial court assessed punishment at ninety days' confinement in the Tarrant County Jail, suspended for fifteen months.

## III. DISCUSSION

We begin with Humphrey's first two points, which challenge the jury charge's inclusion of "alcohol," "dangerous drug," and "controlled substance" in the intoxication definition and the charge's inclusion of a definition of "controlled substance." In addressing these points, we first consider Humphrey's complaint about the jury charge's inclusion of "alcohol" in the intoxication definition and then consider Humphrey's arguments with respect to the inclusion of "dangerous drug" and "controlled substance" in the definition and the charge's inclusion of the statutory "controlled substance" definition. Finally, we address Humphrey's third point raising a jury-argument complaint.

### A. The Charge's Erroneous Intoxication Definition Did Not Cause Egregious Harm.

#### 1. Jury-Charge Error is Subject to Harmless-Error Review.

When the trial court provides an erroneous jury charge, we analyze that error for harm. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). When the defendant complains of jury-charge error to which the defendant did not object, we will reverse the conviction "only if the error is so egregious and created such harm that [the defendant] 'has not had a fair and impartial trial'—in short 'egregious harm.'" *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984); *see also Abdnor v. State*,

8

871 S.W.2d 726, 732 (Tex. Crim. App. 1994). "Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Ngo v. State*, 175 S.W.3d 738, 750 (Tex. Crim. App. 2005). "Egregious harm is a difficult standard to prove[,] and such a determination must be done on a case-by-case basis." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

On the other hand, when the defendant has objected to the error, the appellate court must reverse when the error "is calculated to injure the rights of the defendant," that is, when the record shows the error resulted in "some harm." *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009); *Ngo*, 175 S.W.3d at 743; *Kenney v. State*, No. 02-19-00313-CR, 2021 WL 832718, at *5 (Tex. App.—Fort Worth Mar. 4, 2021, no pet.) (mem. op., not designated for publication). Regardless of whether we are reviewing for some harm or egregious harm, we consider "the entire charge, the state of the evidence, including contested issues and the weight of the probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial court as a whole." *Almanza*, 686 S.W.2d at 171.

## 2. No Egregious Harm Resulted from Including "Alcohol" in the Charge.

Because the trial court must tailor the jury charge to the facts presented at trial, the trial court errs by submitting to the jury parts of the statutory "intoxication" definition that are not supported by the evidence. *Burnett v. State*, 541 S.W.3d 77, 84

(Tex. Crim. App. 2017). Humphrey argues that because there was no evidence that he had consumed alcohol and no evidence that hydrocodone and etizolam are controlled substances or dangerous drugs, the trial court erred by including those substances in the charge's intoxication definition. The State does not address the alleged error in its analysis and instead argues that any error was harmless, which we interpret for purposes of this appeal as a tacit acknowledgment of error. *See id.* (holding trial court erred by submitting entire statutory intoxication definition when there was no evidence of intoxication from any substance other than alcohol). We will therefore assume error and address harm; more specifically, because Humphrey did not object to the charge on this basis, we review the record for egregious harm. *See Almanza*, 686 S.W.2d at 171. We first review whether he was egregiously harmed by the inclusion of "alcohol."

We start by reviewing the entire charge. *See Ngo*, 175 S.W.3d at 750. An application paragraph that correctly instructs the jury weighs against finding egregious harm from an error in the abstract instruction. *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999). Here, however, the application paragraph did not correct the error; instead, it simply stated that the jury should find Humphrey guilty if he operated his vehicle in a public place "while [he] was intoxicated," language that referred the jury back to the erroneous intoxication definition. No other part of the charge corrected the erroneous inclusion of alcohol in the intoxication definition.

10

Nevertheless, as we discuss next, the evidence and arguments at trial weigh against egregious harm.

Our review of the record reveals that there was no real dispute that Humphrey's impairment was not from alcohol. The jury was told that the intoxilyzer test indicated that Humphrey had no alcohol in his system. On the video shown to the jury, although Gresham told Humphrey that he could smell alcohol on Humphrey's breath, Humphrey immediately explained that he had recently used mouthwash, and trial evidence backed up that explanation. Gresham testified that he "determined that that was—there was [mouthwash] that was actually located in [Humphrey's] vehicle, so I took that as the truth that he had just used [mouthwash], which will also give that odor of alcohol." When asked if he was surprised when the intoxilyzer showed that Humphrey had not been drinking, he told the jury, "I would say that I was not exactly surprised because he did say that he had not been drinking and [mouthwash] was found in the car and he admitted to having just used [mouthwash], but he also admitted to taking drugs that morning." In other words, the suggestion that Humphrey had consumed alcohol was dismissed by the same officer who initially raised it, and other evidence supported his conclusion that the odor he detected was caused by mouthwash. Any suggestion that alcohol could have caused Humphrey's impairment was ruled out by the State's own evidence. And in its closing argument, the prosecutor told the jury, "We do not have alcohol in this case, but what

11

we do have is evidence that the Defendant had drugs in his system at the time he was driving."

In considering the harm factors together, we conclude that including the word "alcohol" in the intoxication definition did not deprive Humphrey of a fair and impartial trial. *See Almanza*, 686 S.W.2d at 171. We overrule this part of Humphrey's first point.

### 3. Including "Dangerous Drugs" and "Controlled Substances" Did Not Cause Egregious Harm.

The terms "dangerous drug" and "controlled substance" are statutorily defined by reference to the Texas Controlled Substances Act's drug schedules and penalty groups and are mutually exclusive; while "controlled substance" is defined to include substances that are listed in Schedules I through V or in a penalty group, "dangerous drug" is defined as a device or drug that is *not* on the schedules or in the penalty groups and is unsafe for self-medication. Tex. Health & Safety Code Ann. §§ 481.002(5), 483.001(2); *see also* Tex. Penal Code Ann. § 1.07(16) (incorporating the "dangerous drug" definition in Health and Safety Code Section 483.001).

As we noted above, rather than ruling out controlled substances and dangerous drugs as bases for finding Humphrey intoxicated, the application paragraph merely directed the jury back to the intoxication definition. Further, regarding the inclusion of the term "dangerous drug" in the charge, harm can result when, as here, a term has both a commonly understood meaning and statutory meaning, the common meaning

12

is not defined for the jury, and the common meaning differs from or is more expansive than the statutory meaning. *See e.g.*, *Lindsay v. State*, 102 S.W.3d 223, 231 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). While the charge told the jury what the statutory definition of "controlled substance" is (which, according to Humphrey's second point, created some harm), the jury charge did not explain what the term "dangerous drug" means under Texas law. The common meaning of "dangerous drug" is more expansive than the statutory definition because, although the common meaning and the statutory definition both include substances that are unsafe for self-medication, the common meaning is not limited by reference to schedules or penalty groups. *See Dangerous,* Merriam-Webster.com Dictionary, https://www.merriam-webster.com (last visited July 14, 2021) (defining "dangerous" as "involving possible injury, pain, harm, or loss" and "able or likely to inflict injury or harm"). There was no evidence that either hydrocodone or etizolam is classified as a dangerous drug under Texas law. But the toxicologist testified that etizolam is a "designer drug or a research chemical, and those types of substances are always changing," and Humphrey was questioned about the fact that the drug is illegal to prescribe in the United States. The toxicologist further testified that etizolam is more potent than Xanax, testimony that the State emphasized during its closing arguments. Based on this testimony, the jury could have, in theory, applied the common meaning of "dangerous drug" and concluded—incorrectly—that etizolam fits within that

13

category.[2] But, as with the charge's inclusion of "alcohol," consideration of other factors weighs against egregious harm.

Concerning the state of the evidence, whether hydrocodone and etizolam are statutorily classified as controlled substances or dangerous drugs was not raised as an issue at trial. As Humphrey acknowledges, the only contested issue at trial was whether Humphrey was intoxicated by drugs. More specifically, the contested issue was whether Humphrey's impairment was from intoxication or from something else. In a DWI case, the State does not have to prove what substance a defendant consumed to become intoxicated. *Gray v. State*, 152 S.W.3d 125, 131–32 (Tex. Crim. App. 2004); *Carrasco v. State*, No. 02-17-00142-CR, 2018 WL 283790, at *1 n.2 (Tex. App.—Fort Worth Jan. 4, 2018, no pet.) (mem. op., not designated for publication); *cf. Burnett*, 541 S.W.3d at 84 ("[T]he legislature has adopted a broad definition of 'intoxicated' that focuses on whether a person is intoxicated and not the agent that caused it."). But if, in the attempt to prove intoxication, the State relies on evidence that the defendant ingested a specific substance other than alcohol, it does have to prove that the substance can cause intoxicating effects and that the symptoms of intoxication shown by the defendant indicate intoxication by that substance. *See Burnett*, 541 S.W.3d at 84. The State met that burden here. The toxicologist testified

___

[2]Hydrocodone is listed on a schedule under the Texas Controlled Substances Act, and etizolam is in a penalty group under the Act, meaning that both substances are controlled substances under Texas law. Tex. Health & Safety Code Ann. §§ 481.002(5), .032, .104(a)(2).

14

that etizolam, a central-nervous-system depressant, can cause drowsiness, dizziness, confusion, horizontal gaze nystagmus, and short-term memory loss and that hydrocodone, an opiate, can cause similar signs. And the jury also had before it evidence that Humphrey had experienced memory loss and that, in the field sobriety tests, he had trouble keeping his balance and understanding the officer's instructions.

The terms "controlled substance" and "dangerous drug" were mentioned at trial, but not as a central part of the State's case. Rather, the prosecutor used the terms briefly in questioning Humphrey:

> Q. [the prosecutor] . . . . So when Sergeant Gresham had asked you if you had taken any controlled substance drugs or dangerous drugs or any other substances, did you include [clonazolam][3] when you responded?
>
> A. No.
>
> Q. Well, when you did respond, you said Hydrocodone and muscle relaxers.
>
> A. Correct.
>
> Q. Why did you not include that one?
>
> A. I had not taken any that day.

---

[3]Humphrey does not have a prescription for clonazolam because, like etizolam, it is a benzodiazepine that is not approved for medical use in the United States. International Drug Scheduling, 86 Fed. Reg. 10,097, 10,103 (Feb. 18, 2021) (noting that clonazolam is not approved for medical use in the United States); International Drug Scheduling, Request for Comments, 84 Fed. Reg. 47,521, 47,524 (Sept. 10, 2019) (noting that etizolam is not approved for medical use in the United States). Humphrey orders the drug on the internet, and he told the jury that when he took the etizolam, he believed he was taking clonazolam.

. . . .

Q. Are you aware that items that are not prescribed are controlled substances?

A. I disagree with that statement.

Q. Okay. Are you sure?

A. Yes.

Q. Okay. Why?

A. Ginseng is not a controlled substance.

Q. Ginseng?

A. Yes.

Q. That's a natural—it comes from a plant.

A. Every drug comes from a plant.

Q. Okay. So Etizolam is now illegal and is a controlled substance and you're still getting it off the Internet; is that right?

A. Not intentionally.

Q. How is it not intentional if you press the complete sale, ship it to me?

A. I intended to order [c]lonazolam.

This brief questioning did not make the legal classification of the drugs important to the State's intoxication theory or its efforts to show that the two drugs can and did cause intoxication.

Likewise, Humphrey's defense did not turn on disputing the drugs' classification or potential effects. Humphrey acknowledged that he had taken both

16

hydrocodone and etizolam, did not dispute that those two drugs can cause intoxication, and admitted that he was impaired during the field sobriety tests. Instead, his defensive theory was that he had built up a tolerance for the two drugs and that his impairment was caused by either hitting his head in the (admittedly minor) car accident or by a pre-existing condition, and thus his impairment was not because he was intoxicated. This theory did not depend on and was not affected by the classification of etizolam or hydrocodone.

The jury arguments did not contribute to any harm from the intoxication definition. In the State's opening statement, the prosecutor told the jury, "Now, the evidence that you'll hear from that witness stand will show that the Defendant was intoxicated by the introduction of drugs into his system." Humphrey's attorney told the jury that on the morning of the accident, Humphrey took "medication for pain" as he does every day. He also brought up Humphrey's medical issues, stating that Humphrey had had "a very serious concussion six months prior." He mentioned prior concussions and Humphrey's alleged amnesia as well. Neither party mentioned the phrase "dangerous drug" or "controlled substance."

The parties' closing arguments, like their opening statements, focused primarily on whether the drugs caused Humphrey's impairment or whether a pre-existing medical condition or a concussion caused it. When they mentioned the substances at issue, the prosecutor and Humphrey's attorney both referred to them by their names or as pills, drugs, or, in one instance, central-nervous-system depressants. And the

17

prosecutor's arguments urged the jury to convict Humphrey on the basis of intoxication by drugs:

> During voir dire, we talked about the definition of intoxication, how we had three different ways to prove to you that someone has been intoxicated while driving. First, the person had lost the normal use of their mental faculties. The second, the loss of their physical faculties. Finally, the third would be the blood alcohol concentration of .08. We do not have alcohol in this case, but what we do have is evidence that the Defendant had drugs in his system at the time he was driving.
>
> . . . .
>
> . . . . It was a minor accident, like Sergeant Gresham told you. A minor accident caused by the Defendant losing the normal use of mental and physical faculties due to the introduction of the drugs that were found in his system.
>
> . . . .
>
> . . . . Because of that, I'm asking you to find him guilty of driving while intoxicat[ed] due to the introduction of the drugs that were in his system.

And the only instances when the prosecutor used the terms "controlled substance" and "dangerous drugs" in questioning witnesses occurred in the above-quoted parts of Humphrey's testimony.

On balance, in light of the evidence and arguments and the issues contested at trial, the intoxication definition did not affect the case's foundation, deny Humphrey a valuable right, or significantly affect Humphrey's defensive theories, and thus did not cause Humphrey egregious harm. *See Ngo*, 175 S.W.3d at 750.

18

Finally, Humphrey argues that the cumulative effect of including the terms "alcohol," "controlled substance," and "dangerous drug" in the intoxication definition and defining controlled substances (discussed below) constitutes egregious harm. We disagree; as we discuss above and under Humphrey's second point, the record does not indicate that the charge errors gave the State an unfair advantage or that the errors rendered the trial fundamentally unfair. *See Lumsden v. State*, 564 S.W.3d 858, 899 (Tex. App.—Fort Worth 2018, pet. ref'd) (citing *Linney v. State*, 413 S.W.3d 766, 767 (Tex. Crim. App. 2013) (Cochran, J., concurring in refusal of pet.) (explaining the doctrine of cumulative error and stating that "[a] string of harmless errors does not arithmetically create reversible, cumulative error")).

We overrule the remainder of Humphrey's first point.

## B. The Controlled-Substance Definition Did Not Injure Humphrey's Rights.

In Humphrey's second point, he complains that the trial court erred by including the statutory definition of a "controlled substance" in the charge when no evidence showed that Humphrey's medications were controlled substances. As with the intoxication definition, the State's brief skips straight to a harm analysis, which we take as an admission of error for purposes of this appeal. Because Humphrey's attorney objected to including a controlled-substance definition in the charge,[4] we

---

[4]The exact basis of the objection is not entirely clear; Humphrey's attorney stated, "I don't think it applies. That's not what he's been charged for. That definition of intoxicated is pretty clear what we're going for." Based on this statement and the prosecutor's statement in response that he had originally thought the

review the record for some harm from the definition's inclusion. "Some" harm means "*any* harm, regardless of degree," *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986), but it includes only "actual—rather than merely theoretical— harm." *Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019).

As we noted above, neither the application paragraph nor any other part of the charge limited the jury to considering only whether Humphrey was intoxicated by drugs, and the inclusion of a controlled-substance definition could have further indicated to the jury that it could consider whether Humphrey had become intoxicated by a controlled substance. But nevertheless, the statutory controlled-substance definition did not raise the kind of concern usually implicated by superfluous and nonstatutory definitions or instructions; it could not have emphasized or given weight to any schedule or penalty group evidence because there was no schedule or penalty group evidence.[5] *See Kirsch*, 357 S.W.3d at 651 (stating that a trial court "may not include an instruction that focuses the jury's attention on a specific

definition's inclusion "went to an offense extraneous that was not filed out of the same criminal episode," Humphrey's attorney may have been arguing that the definition had no relevance because Humphrey had not been charged with an offense related to possession of a controlled substance. But regardless of the underlying argument, the trial court understood Humphrey's request and rejected it. *See* Tex. R. App. P. 33.1

[5]Although the prosecutor used the words "controlled substance," a prosecutor's questions to a witness are not evidence, and the prosecutor did not mention penalty groups or schedules. *Stobaugh v. State*, 421 S.W.3d 787, 837 n.238 (Tex. App.—Fort Worth 2014, pet. ref'd); *Wells v. State*, 730 S.W.2d 782, 786 (Tex. App.—Dallas 1987, pet. ref'd).

20

type of evidence that may support a finding of an element of an offense"); *Hess v. State*, 224 S.W.3d 511, 514 (Tex. App.—Fort Worth 2007, pet. ref'd) (stating that "trial judges must refrain from making any remark calculated to convey to the jury his or her opinion of the evidence in a particular case"). Nor is there any evidence that the definition confused the jury. And we must assume that the jury applied the controlled-substance definition, *see Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *Scott v. State*, 555 S.W.3d 116, 124 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd), meaning that the jury would have found that Humphrey had ingested a controlled substance only if it had heard evidence that the drugs were scheduled or in penalty groups.[6]

As for the state of the evidence, it weighs against finding any actual harm. Humphrey acknowledged taking the two drugs, and the decision for this jury was relatively simple and turned on accepting or rejecting Humphrey's explanations of his condition, which had nothing to do with whether the drugs were controlled substances. If the jury believed Humphrey, then he could take the two drugs without

---

[6]As a matter of law, etizolam and hydrocodone *are* controlled substances, and Humphrey admitted taking them; thus, if either or both of the drugs caused Humphrey's intoxication, then, as a matter of law, he was intoxicated by a controlled substance or a combination of controlled substances. *See, e.g.*, *Falero v. State*, No. 02-19-00205-CR, 2020 WL 1949018, at *5 (Tex. App.—Fort Worth Apr. 23, 2020, pet. ref'd) (mem. op., not designated for publication) (noting that the substance that the defendant was charged with possessing was included in Penalty Group 1 and was therefore a controlled substance as a matter of law and that defendant thus suffered no harm from the inclusion of the nonstatutory phrase "methamphetamine is a controlled substance" in the charge).

21

experiencing side effects, and his impairment at the time of his arrest—witnessed and attested to by Gresham, displayed on the video played for the jury, and confessed to by Humphrey—was caused by Humphrey hitting his head in the car accident, by a pre-existing medical condition, or both. On the other hand, if the jury did not believe Humphrey's explanations, then he took two drugs to which he did not have a tolerance (or at least not as much as he thought he did) and which are known to cause the intoxication signs that he displayed and one of which is "pretty high up" on the potency scale. Defining the term "controlled substance" had no relation to Humphrey's explanations and would not have helped or nudged the jury to either believe or disbelieve him.

Regarding jury arguments, as explained above, neither side's counsel emphasized the term "controlled substance," and they did not mention penalty groups or schedules. The prosecutor did not attempt to argue in opening or closing that the drugs were controlled substances or ask the jury to convict on that basis, and the defense did not try to argue that Humphrey could not be convicted because the State had failed to prove that the drugs were controlled substances. The parties' arguments focused on whether it was the drugs or a medical condition that caused Humphrey's impairment.

When, as here, the record "reveals a risk of harm that is so small that it may properly be characterized as not 'remotely significant,' or where the risk of harm is 'almost infinitesimal,' any harm resulting from the error is only theoretical harm."

22

*French v. State*, 563 S.W.3d 228, 239 (Tex. Crim. App. 2018). On this record, we conclude that Humphrey suffered no actual harm from the inclusion of the controlled-substance definition in the jury charge. We overrule Humphrey's second point.

## C. Humphrey Did Not Preserve His Jury Argument Complaint.

In his third point, Humphrey argues that the State made an improper jury argument that clearly misstated the evidence and had a substantial and injurious influence on the jury's verdict. Humphrey is correct that the prosecutor's argument misstated a witness's testimony, but because Humphrey did not preserve this complaint, we overrule it.

In closing arguments, the prosecutor misstated the record when he said that the toxicologist "told you that [e]tizolam is at least five times more potent than your typical Xanax." Humphrey's attorney objected, "He did not testify to that, that it's more potent. He never said that." While the toxicologist Johnson had testified that etizolam was more potent than Xanax and was "pretty high up there" on the potency scale, he had not specified how much more potent. In response to Humphrey's objection, the trial court stated, "The jury will remember the evidence." The prosecutor then again stated that Johnson had said "five times more potent."

A trial court's statement that "the jury will remember the evidence" is not an adverse ruling on an objection and does not serve to preserve error. *Mayberry v. State*, 532 S.W.2d 80, 84 (Tex. Crim. App. 1975); *Washington v. State*, 16 S.W.3d 70, 73 (Tex.

App.—Houston [1st Dist.] 2000, pet. ref'd). Thus, Humphrey has not preserved this complaint for appeal.

Humphrey acknowledges that he has not preserved his complaint. But, citing *Janecka v. State*, 937 S.W.2d 456, 474 (Tex. Crim. App. 1996), Humphrey argues that "an appellate court may, in the interest of justice, review unobjected-to jury arguments that are manifestly improper." The Court of Criminal Appeals has rejected that part of *Janecka* both as dicta and as no longer an accurate statement of the law. *Threadgill v. State*, 146 S.W.3d 654, 670 (Tex. Crim. App. 2004); *see also McDonald v. State*, 186 S.W.3d 86, 91 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Because Humphrey failed to secure an adverse ruling, "he has forfeited his right to raise the issue on appeal." *See Threadgill*, 146 S.W.3d at 670; *see also Hernandez v. State*, 538 S.W.3d 619, 622–23 (Tex. Crim. App. 2018) ("Even an inflammatory jury argument is forfeited if the defendant does not pursue his objection to an adverse ruling."). We overrule Humphrey's third point.

## IV. CONCLUSION

Having overruled Humphrey's three points, we affirm the trial court's judgment.

/s/ Dana Womack
Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 22, 2021